UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

FILED

SEP 0 1 2015

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT GLEN ANDREW, II, and
MO-TRIM, INC.,

Defendants.

Criminal No.  2:15cr16

Violations:
18 U.S.C. § 2
18 U.S.C. § 641
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1512
18 U.S.C. § 1962

Forfeiture:
18 U.S.C. § 981
18 U.S.C. § 1963
21 U.S.C. § 853
21 U.S.C. § 2461

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE

(Racketeer Influenced and Corrupt Organizations Act Conspiracy)

### The Enterprise

1.      At all times relevant to this Indictment, the West Virginia Division of Highways

("WVDOH"), as established by the West Virginia Code, Chapter 17, Article 2A, Section 1,

effective April 7, 1993, and continued in effect today, constituted an "enterprise," to wit:  a legal

entity, as defined in Title 18, United States Code, Section 1961(4).  The WVDOH, an agency of

the West Virginia Department of Transportation, was comprised of a number of administrative

1

divisions, including the Equipment Division located in Buckhannon, West Virginia, and ten district field offices located throughout the State of West Virginia. The WVDOH engaged in, and its activities affected, interstate and foreign commerce.

<strong><u>Purposes of the Enterprise</u></strong>

2.      The primary purposes of the WVDOH included the planning, engineering, construction, repair, and maintenance of the roads of the State of West Virginia.

<strong><u>The Defendants</u></strong>

3.      At various times relevant to this Indictment, defendant **ROBERT GLEN ANDREW, II** was employed by the WVDOH as the director of the Equipment Division, which provided direct and indirect major equipment maintenance, repair, rebuild, service support, parts support, and technical advice to the ten district field offices. In this position, **ANDREW** was responsible for overseeing the operation of the Equipment Division and supervising approximately 100 employees of the Equipment Division. In addition, **ANDREW** managed and oversaw the equipment needs of the ten district field offices.

4.      At all times relevant to this Indictment, **MO-TRIM, INC.** was a corporation in the business of building large commercial mowers to cut grass, bushes, and brush near highways, operating its business at or near Cambridge, Ohio, which is located in the Southern District of Ohio. At various times relevant to this Indictment, **MO-TRIM** was an associate of the WVDOH as a vendor engaged in business with the WVDOH.

<strong><u>Purposes of the Defendants</u></strong>

5.      The primary purposes of the defendants included:

a.      using their positions as an employee and an associate to enrich themselves;

2

                b.       violating the legitimate purposes of the WVDOH to further their illegal schemes; and

                c.       creating a culture of corruption inside and outside the WVDOH that would allow them to continue the racketeering activity and to protect and expand their use of the enterprise for criminal operations.

### Roles of the Defendants

6.     At various times relevant to this Indictment, defendant **ROBERT GLEN ANDREW, II** was employed by the WVDOH as the director of the Equipment Division.  In this position, **ANDREW** had a duty to further the purposes of the WVDOH, among other things, by ensuring that he and his subordinates prepare competitive bid specifications which are fair and open to all potential vendors and which seek to obtain the best value for the State of West Virginia; by ensuring that he and his subordinates comply with all terms and conditions of existing contracts with vendors; by seeking to award contracts to the most qualified bidder; by ensuring that he and his subordinates seek to obtain the best value for salvage materials for the State of West Virginia; by ensuring that state resources, including employees and equipment, are used to further the legitimate purposes of the WVDOH; and by ensuring that he and his subordinates comply with the statutes and regulations which govern the use and disposition of federal excess property.  **ANDREW** abused his position of trust as an employee by engaging in illegal activities for the purpose of enriching himself.  **ANDREW** prepared, and directed subordinates to prepare, non-competitive bid specifications which favored particular vendors and which did not seek to obtain the best value for the State of West Virginia.  **ANDREW** violated, and directed subordinates to violate, terms and conditions of existing contracts with vendors. **ANDREW** solicited a vendor to increase a bid after the bid had closed.  **ANDREW** received a

bribe from this vendor to salvage better-than-salvage materials.  **ANDREW** used state resources, including employees and equipment, to engage in political activity on state time.  **ANDREW** violated, and directed others to violate, the statutes and regulations which govern the use and disposition of federal excess property by selling, and directing others to sell, the property.

      7.      At various times relevant to this Indictment, defendant **MO-TRIM, INC.** was a corporation in the business of building large commercial mowers and was a vendor which held a mower parts contract with the WVDOH.  **MO-TRIM** facilitated the criminal activities of **ANDREW** and his subordinates by participating with **ANDREW** and his subordinates in the preparation of non-competitive bid specifications which favored particular vendors, including **MO-TRIM**, and which did not seek to obtain the best value for the State of West Virginia; and by participating with **ANDREW** and his subordinates in the violation of the terms and conditions of the mower parts contract which **MO-TRIM** held with the WVDOH.

<u>**Means and Methods of the Defendants**</u>

      8.      The means and methods by which the defendants and others agreed to conduct the affairs of the WVDOH included the following, among others:

      a.      combining, colluding, and conspiring with respect to the purchasing and supplying of services and commodities for the purpose and effect of causing one prospective vendor or vendors to be preferred over another;

      b.      combining, colluding, and conspiring with respect to the purchasing and supplying of commodities for the purpose and effect of causing the State of West Virginia to pay a higher price for such commodities than would have been paid in the absence of such combination, collusion, and conspiracy;

c.    accepting and agreeing to accept from another, directly and indirectly, a pecuniary benefit as consideration for the recipient's official action as a public servant;

d.    defrauding the State of West Virginia of wages and resources by engaging and directing others to engage in political activities on state time;

e.    defrauding the State of West Virginia of wages and resources by engaging and directing others to engage in the maintenance and transportation of auctioned WVDOH equipment;

f.    converting federal excess personal property acquired by the WVDOH from the General Services Administration ("GSA");

g.    using the facilities, equipment, and resources of the WVDOH, including, but not limited to, WVDOH vehicles, computers, telephones, and fax machines; and

h.    misrepresenting, concealing, and hiding, and causing to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the conspiracy.

## Racketeering Conspiracy

9.    From at least in or about 2009, through and including in or about August 2014, within the Northern District of West Virginia, and elsewhere, including but not limited to, the Southern District of West Virginia and the Southern District of Ohio, the defendants, **ROBERT GLEN ANDREW, II** and **MO-TRIM, INC.**, and others known and unknown, including E.M.T. and J.O.C., being persons employed by and associated with the WVDOH, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity consisting of:

a.      multiple acts indictable under the following provisions of federal law:

i.      Title 18, United States Code, Sections 1341, 1343, and 1346 (mail fraud and wire fraud);

ii.     Title 18, United States Code, Section 1512 (witness and document tampering); and

b.      multiple acts involving bribery in violation of the laws of West Virginia, to wit, West Virginia Code, Chapter 61, Article 5A, Section 3.

10.     It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## Overview of Schemes

11.     The racketeering conspiracy was comprised of at least the following schemes:

### *MO-TRIM Scheme*

a.      From in or about January 2009, to in or about August 2014, the defendants and others participated in a scheme to defraud the State of West Virginia.  It was part of the scheme for the defendants to misuse a contract between the WVDOH and defendant **MO-TRIM, INC.** for the purchase of **MO-TRIM** mower parts.  The misuse of the parts contract included the intentional failure to comply with, and the manipulation of, a provision in the contract which prohibited the WVDOH from purchasing "whole unit components" from **MO-TRIM**.  This term included, but was not limited to, rear flail units, side flail units, rotary head units, and short arm units.  Despite this provision, defendant **ROBERT GLEN ANDREW, II** directed employees of the WVDOH to purchase whole unit components from **MO-TRIM**.  In furtherance of this part of the scheme, **ANDREW** and others requested that **MO-TRIM** invoice a whole unit component as its individual parts, **ANDREW** and others requested that **MO-TRIM** split invoices, **ANDREW**

6

and others requested that **MO-TRIM** create documents purporting to add a whole unit component to the parts list which had accompanied the parts contract, **ANDREW** and others directed employees of the WVDOH to use state purchasing cards to pay the invoices, and **ANDREW** and others directed employees of the WVDOH to not assign equipment numbers to the whole unit components that had been purchased. The misuse of the parts contract also included the intentional failure to comply with a provision in the contract which required **MO-TRIM** to bear shipping costs. Despite this provision, **ANDREW** directed employees of the WVDOH to transport tractors to and from **MO-TRIM** in Cambridge, Ohio for the purpose of having employees of **MO-TRIM** assemble and install whole unit components on the tractors. It was also part of the scheme for the defendants and others to conspire to rig certain WVDOH bids. In furtherance of this part of the scheme, the defendants and others jointly prepared bid specifications in an attempt to ensure that a particular vendor of tractors that are compatible with **MO-TRIM** mowers would win the tractor purchase contract with the WVDOH, and that **MO-TRIM** would win the mower purchase contract with the WVDOH. Because specifications protests prevented the award of a mower purchase contract, the defendants continued to misuse the parts contract the WVDOH had with **MO-TRIM**. By manipulating and avoiding the competitive bidding process, this scheme caused the WVDOH to incur additional costs in its acquisition of mowers.

### *3-D Salvage Scheme*

b.    From in or about August 2011 to in or about October 2013, defendant **ROBERT GLEN ANDREW, II** and others participated in a bid-rigging and bribery and kickback scheme with 3-D Salvage, a West Virginia company in the business of scrapping salvageable materials. It was part of the scheme that **ANDREW** conspired with 3-D Salvage

7

owner T.B.D. to rig the salvage contract with the WVDOH by permitting T.B.D. to change his bid after the bid request had closed.  This part of the scheme defrauded the true winner of the bid, J.S., who had submitted the highest bid before **ANDREW** permitted T.B.D. to change his bid.  It was also a part of the scheme for **ANDREW** to place, and direct others to place, better-than-salvage materials in the salvage bin in return for bribery and kickback payments by T.B.D.  This part of the scheme defrauded the State of West Virginia of the use of, and true value of, the better-than-salvage materials.

### *Political Activity Scheme*

c.      From in or about March 2011 through in or about October 2011, defendant **ROBERT GLEN ANDREW, II** and others participated in a scheme to defraud the State of West Virginia of wages and resources by having state employees on state time and using state equipment and resources engage in political activity in support of the 2011 gubernatorial campaign of Earl Ray Tomblin (the "Tomblin Campaign").  It was part of the scheme that **ANDREW** solicited and collected, and directed other state employees to solicit and collect, thousands of dollars in contributions for the Tomblin Campaign on state time.  It was also part of the scheme that **ANDREW** negotiated and placed, and directed other state employees to negotiate and place, banners on tractor trailers throughout the state for the Tomblin Campaign.  In furtherance of the scheme to defraud the State of West Virginia, **ANDREW** directed subordinates to submit false documentation seeking reimbursement for expenses incurred on trips which were solely and/or primarily for the purpose of engaging in political activity and approved the false documentation, which resulted in the mailing of reimbursement checks.  In furtherance of the scheme, **ANDREW** also directed subordinates to submit false information which resulted in the creation of Daily Labor Reports which falsely indicated the hours they had

worked had been for legitimate state work, which resulted in interstate wire transfers of payroll deposits.

### Post-Auction Scheme

d.      At all times relevant to the Indictment, the WVDOH would periodically hold auctions to sell WVDOH-owned equipment.  The terms and conditions of the auctions were that the equipment was sold as-is, paid for in 30 days and removed from state property at the expense of the buyer.  In or about April 2011 and October 2011, defendant **ROBERT GLEN ANDREW, II** participated in a scheme to defraud the State of West Virginia of wages and resources by having E.M.T. and another state employee on state time and using state equipment and resources engage in maintenance and transportation of equipment after the equipment was sold at auction.   In furtherance of the scheme to defraud the State of West Virginia, **ANDREW** directed E.M.T. to submit false documentation seeking reimbursement for expenses incurred on the trips which were primarily for the purpose of transporting the equipment, resulting in the mailing of reimbursement checks to E.M.T.  In furtherance of the scheme, **ANDREW** also directed E.M.T. to submit false information which resulted in the creation of Daily Labor Reports which falsely indicated that the hours he had worked had been for legitimate state work, resulting in interstate wire transfers of payroll to the account of E.M.T.

### GSA Scheme

e.      At all times relevant to this Indictment, the WVDOH was a participant in the Federal Excess Property Program pursuant to which it acquired federal excess personal property through the GSA.  This program did not permit the WVDOH to sell or otherwise dispose of the property.  From in or about October 2011 to in or about July 2013, defendant **ROBERT GLEN ANDREW, II** and others participated in a scheme to unlawfully dispose of

federal excess personal property.  It was part of the scheme for **ANDREW** to place, and direct others to place, federal excess personal property into salvage bins to be picked up by 3-D Salvage.  It was also part of the scheme, for **ANDREW** to sell, and direct others to sell, federal excess property at WVDOH auctions conducted at the Equipment Division.

## Overt Acts

12.     In furtherance of the racketeering conspiracy, and to the effect the object thereof, the defendants, **ROBERT GLEN ANDREW, II** and **MO-TRIM, INC.,** and their co-conspirators committed and caused to be committed the following overt acts, among others, in furtherance of the following schemes on or about the following dates, in the Northern District of West Virginia, and elsewhere, including but not limited to, the Southern District of West Virginia and the Southern District of Ohio.

### *MO-TRIM Scheme*

13.     Between on or about December 1, 2009, and on or about December 16, 2009, at the direction of defendant **ROBERT GLEN ANDREW, II**, R.A., a WVDOH employee of District III at or near Parkersburg, West Virginia, called an employee of defendant **MO-TRIM, INC.** and authorized the use of his state purchasing card to pay three **MO-TRIM** invoices totaling $21,509.43 for mower whole unit components mounted by **MO-TRIM** employees on Tractor No. 131-265:

   a.     On or about December 1, 2009, R.A. authorized the use of his state purchasing card to pay a **MO-TRIM** invoice in the amount of $7,780.50.

   b.     On or about December 4, 2009, R.A. authorized the use of his state purchasing card to pay a **MO-TRIM** invoice in the amount of $4,910.58.

  c. On or about December 16, 2009, R.A. authorized the use of his state purchasing card to pay a **MO-TRIM** invoice in the amount of $8,818.35.

14. On or about November 22, 2010, at the direction of defendant **ROBERT GLEN ANDREW, II**, J.B., a WVDOH employee of the Equipment Division, called an employee of defendant **MO-TRIM, INC.** and authorized the use of his state purchasing card to pay three **MO-TRIM** invoices totaling $21,509.43 for mower whole unit components mounted by **MO-TRIM** employees on Tractor No. 131-302, and four **MO-TRIM** invoices totaling $27,375.43 for mower whole unit components mounted by **MO-TRIM** employees on Tractor No. 131-282.

15. Between on or about March 15, 2011, and March 18, 2011, at the direction of defendant **ROBERT GLEN ANDREW, II**, P.L., a WVDOH employee of District IV at or near Clarksburg, West Virginia, called an employee of defendant **MO-TRIM, INC.** and authorized the use of his state purchasing card to pay four **MO-TRIM** invoices totaling $27,375.43 for mower whole unit components mounted by **MO-TRIM** employees on Tractor No. 131-271:

  a. On or about March 15, 2011, P.L. authorized the use of his state purchasing card to pay three **MO-TRIM** invoices in the amounts of $8,818.35, $7,780.50, and $4,910.58.

  b. On or about March 18, 2011, P.L. authorized the use of his state purchasing card to pay a fourth **MO-TRIM** invoice in the amount of $5,866.00.

16. On or about April 8, 2011, at the direction of defendant **ROBERT GLEN ANDREW, II**, P.L. called an employee of defendant **MO-TRIM, INC.** and authorized the use of his state purchasing card to pay four **MO-TRIM** invoices totaling $27,375.43 for mower whole unit components mounted by **MO-TRIM** employees on Tractor No. 131-288.

17.     Between on or about June 30, 2011, and on or about July 22, 2011, J.O.C., owner of defendant **MO-TRIM, INC.**, sent, and directed to be sent, via facsimile and electronic mail to defendant **ROBERT GLEN ANDREW, II** and others, various bid specifications for the upcoming WVDOH bid request for a tractor purchase contract.  On or about September 1, 2011, the West Virginia Purchasing Division issued a Request for Quotation soliciting bids for the tractor purchase contract using verbatim a number of the specifications provided by J.O.C.

18.     Between on or about July 8, 2011, and on or about August 17, 2011, J.O.C., owner of defendant **MO-TRIM, INC.**, sent, and directed to be sent, via facsimile and electronic mail to defendant **ROBERT GLEN ANDREW, II** and others, various bid specifications for the upcoming WVDOH bid request for a mower purchase contract.  On or about September 22, 2011, the West Virginia Purchasing Division issued a Request for Quotation soliciting bids for the mower purchase contract using verbatim a number of the specifications provided by J.O.C. On or about January 25, 2012, after several protests of the specifications, the West Virginia Purchasing Division cancelled this bid request.

19.     Between on or about October 30, 2012, and on or about November 1, 2012, at the direction of defendant **ROBERT GLEN ANDREW, II**, J.B. and L.L., also a WVDOH employee of the Equipment Division, called an employee of defendant **MO-TRIM, INC.** and authorized the use of their state purchasing cards to pay three **MO-TRIM** invoices totaling $20,119.24 for mower whole unit components mounted by **MO-TRIM** employees to Tractor No. 137-156:

        a.     On or about October 30, 2012, J.B. authorized the use of his state purchasing card to pay two **MO-TRIM** invoices in the amounts of $4,707.96 and $8,818.38.

      b.      On or about November 1, 2012, L.L. authorized the use of her state purchasing card to pay a MO-TRIM invoice in the amount of $5,866.00.

20.      On or about August 12, 2013, at the direction of defendant **ROBERT GLEN ANDREW, II**, J.B. contacted an employee of defendant **MO-TRIM, INC.** to authorize use of his state purchasing card to pay a **MO-TRIM** invoice in the amount of $7,780.50 for a mower whole unit component mounted by **MO-TRIM** employees on Tractor No. 131-172.

### *3-D Salvage Scheme*

21.      On or about October 26, 2012, the Equipment Division drafted a bid sheet for a 12-month scrap metal agreement not to exceed $25,000.00. The bid sheet indicated that the agreement would be "for the purchase and removal of accumulations of all scrap metal including, but not limited to culverts, wire cable, automotive, truck equipment and construction metals, 55 gallon metal drums, vehicle and heavy equipment fuel tanks, metal storage tanks and salt spreaders." The bid sheet also indicated that payments were to be made by check.

22.      On or about November 7, 2012, the Equipment Division received three bids, including a bid by T.B.D. of 3-D Salvage. On or about this date, defendant **ROBERT GLEN ANDREW, II** contacted T.B.D. via telephone and informed him that 3-D Salvage was not the high bidder and asking T.B.D. if he could increase his bid from $200.00 per gross ton to $225.00 per gross ton. On or about the same date, T.B.D. whited out his previous bid, wrote in "$225.00," and faxed the amended bid sheet to the Equipment Division.

23.      On or about November 26, 2012, at the direction of defendant **ROBERT GLEN ANDREW, II**, D.B., an employee of the Equipment Division, mailed T.B.D. a Form CX-9, which requested that he sign the attached State of West Virginia Purchasing Division Agreement and return it to the Equipment Division.

13

24.    On or about November 28, 2012, T.B.D. signed the agreement, which was to run from December 1, 2012, to November 30, 2013, and returned it to the Equipment Division.

25.    On or about December 3, 2012, D.B. mailed the Purchasing Division Agreement signed by T.B.D. to the West Virginia Department of Transportation.

26.    In or about the middle of July 2013, defendant **ROBERT GLEN ANDREW, II** asked T.B.D. to pay in cash for pickups of cinder beds, equipment that is attached to the backs of trucks to spread cinders on the roads, also known as "spreaders."   **ANDREW** had directed T.B.D. to come to the Equipment Division to look at fifty (50) or sixty (60) cinder beds that were to be scrapped.  T.B.D. went down to the Equipment Division and, over the course of about two weeks, received the cinder beds as scrap.  In or about this time, **ANDREW** told T.B.D. that he could pay by cash for these cinder beds, even though the contract provided that payments would be made by check.  T.B.D. obliged by paying the defendant or E.M.T. approximately $4,000.00 in cash for the cinder beds.  These cash payments were in addition to check payments T.B.D. made to WVDOH for cinder beds he picked up officially on the contract.

27.    Immediately following the scrapping of the cinder beds, defendant **ROBERT GLEN ANDREW, II** and E.M.T. approached T.B.D. and indicated they would ensure additional good material was scrapped if he would compensate them over and beyond the contract.  When T.B.D. showed uneasiness about this bribery and kickback scheme, **ANDREW** threatened that if T.B.D. did not participate in the scheme, he would make sure T.B.D. did not get the next salvage contract and he would make sure T.B.D. had problems at future WVDOH auctions.  Because T.B.D. had spent hundreds of thousands of dollars at WVDOH auctions and did not want to jeopardize that business, he agreed to participate in the bribery and kickback scheme.

28.     In or about the end of July 2013, at the direction of defendant **ROBERT GLEN ANDREW, II**, Equipment Division employees R.L.C. and L.J. placed approximately six (6) sheets of aluminum plates into the dumpsters located at or near the Upshur County WVDOH facility located near the Equipment Division.

29.     On or about July 29, 2013, at the direction of defendant **ROBERT GLEN ANDREW, II**, E.M.T. accompanied T.B.D. to at or near the Upshur County WVDOH facility and showed him the aluminum plates in the dumpsters.  On or about the same date, T.B.D. completed a Verification of Service indicating that he had picked up salvaged equipment from the roll-off dumpsters located at or near the Upshur County WVDOH facility.  E.M.T. signed the Verification of Service on behalf of the WVDOH.

30.     On or about July 30, 2013, T.B.D. paid the Equipment Division $2,839.79 via check for the July 29, 2013, pick up.

31.     On or about August 1, 2013, T.B.D. sold the aluminum plates and other steel received from WVDOH to RRHAMCO Inc. of Grafton, West Virginia, for a total of $18,203.70. The aluminum plates accounted for $14,843.20 of the total.  On or about the same date, T.B.D. went to First Community Bank and obtained an official check in the amount of $13,203.70 and cash in the amount of $5,000.00 because defendant **ROBERT GLEN ANDREW, II** and E.M.T. had said they wanted a kickback of $3,000.00 for the July 29, 2013 load.

32.     Later in or about August 2013, T.B.D. hand-delivered $3,000.00 in cash to defendant **ROBERT GLEN ANDREW, II** at the Equipment Division.

### *Political Activity Scheme*

33.     From on or about March 27, 2011 to on or about March 29, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., provided information which resulted in the creation of false Daily Labor Reports claiming that E.M.T. had worked overtime and had performed legitimate state business from on or about March 27, 2011 through on or about March 29, 2011, even though during that time period, E.M.T. had in fact traveled from at or near Buckhannon, West Virginia to at or near Ranson, West Virginia, at the direction of **ANDREW** and using a WVDOH vehicle, to engage in political activity on behalf of the Tomblin Campaign, thereby defrauding the State of West Virginia and depriving it of wages and resources.

34.     On or about March 30, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., completed and submitted a false Travel Expense Account Settlement claiming that the purpose of E.M.T.'s travel on or about March 27, 2011 through on or about March 29, 2011 was to check equipment and was in connection with his assigned duties, and seeking reimbursement for expenses of the trip even though E.M.T. completed no legitimate state work during the trip, thereby defrauding the State of West Virginia of resources in the amount of $291.50.

35.     On or about March 31, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., provided information which resulted in the creation of false Daily Labor Reports claiming that E.M.T. had performed legitimate state business on or about March 31, 2011, even though on that date, E.M.T. had in fact traveled from at or near Buckhannon, West Virginia to at or near Pennsboro, West Virginia, on state time and in a state vehicle, to

collect campaign contributions for the Tomblin Campaign, thereby defrauding the State of West

Virginia and depriving it of wages and resources.

36.     From on or about April 4, 2011 to on or about April 5, 2011, defendant **ROBERT**

**GLEN ANDREW, II** and others, including E.M.T., provided information which resulted in the

creation of false Daily Labor Reports  claiming that E.M.T. had performed legitimate state

business from on or about April 4, 2011 through on or about April 5, 2011, even though during

that time period, E.M.T. had in fact traveled from at or near Buckhannon, West Virginia to at or

near Wheeling, West Virginia, at defendant's direction and using a WVDOH vehicle, to engage

in political activity on behalf of the Tomblin Campaign, thereby defrauding the State of West

Virginia and depriving it of wages and resources.

37.     On or about April 7, 2011, defendant **ROBERT GLEN ANDREW, II** and

others, including E.M.T., completed and submitted a false Travel Expense Account Settlement

claiming that the purpose of E.M.T.'s travel on or about April 4, 2011 through on or about April

5, 2011 was to check equipment and was in connection with his assigned duties, and seeking

reimbursement for expenses of the trip even though E.M.T. completed no legitimate state work

during the trip, thereby defrauding the State of West Virginia of resources in the amount of

$163.00.

38.     On or about April 7, 2011, defendant **ROBERT GLEN ANDREW, II** and

others, including E.M.T., provided information which resulted in the creation of false Daily

Labor Reports claiming that E.M.T. had performed legitimate state business on or about April 7,

2011, even though on that date, E.M.T. had in fact traveled from at or near Buckhannon, West

Virginia to at or near Parkersburg, West Virginia, on state time and in a state vehicle, to collect

campaign contributions for the Tomblin Campaign, thereby defrauding the State of West Virginia and depriving it of wages and resources.

39.    From on or about April 11, 2011 to on or about April 13, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., provided information which resulted in the creation of false Daily Labor Reports claiming that E.M.T. had performed legitimate state business from on or about April 11, 2011 through on or about April 13, 2011, even though during that time period, E.M.T. had in fact traveled from at or near Buckhannon, West Virginia to at or near Wheeling, West Virginia, at defendant's direction and using a WVDOH vehicle, to engage in political activity on behalf of the Tomblin Campaign, thereby defrauding the State of West Virginia and depriving it of wages and resources.

40.    On or about April 14, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., completed and submitted a false Travel Expense Account Settlement claiming that the purpose of E.M.T.'s travel on or about April 11, 2011 through on or about April 13, 2011 was to check equipment and do preventative maintenance and was in connection with his assigned duties, and seeking reimbursement for expenses of the trip even though E.M.T. completed no legitimate state work during the trip, thereby defrauding the State of West Virginia of resources in the amount of $303.00.

### *Post-Auction Scheme*

41.    From on or about April 26, 2011 to on or about April 28, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., provided information which resulted in the creation of false Daily Labor Reports claiming that E.M.T. had performed legitimate state business from on or about April 26, 2011 through on or about April 28, 2011, even though during that time period, E.M.T. had in fact traveled from at or near Buckhannon,

West Virginia to at or near Baltimore, Maryland, at defendant's direction, to transport a piece of equipment sold by WVDOH to a buyer at auction, thereby defrauding the State of West Virginia and depriving it of wages and resources.

42.    From on or about May 2, 2011 to on or about May 9, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., drafted a fraudulent request for travel authorization and completed and submitted a false Travel Expense Account Settlement claiming that the purpose of E.M.T.'s travel on or about April 26, 2011 through on or about April 28, 2011 was to screen GSA equipment and was in connection with his assigned duties, and seeking reimbursement for expenses of the trip even though E.M.T. completed no legitimate state work on or about April 26, 2011 and any state work he completed on or about April 27, 2011 through on or about April 28, 2011 was merely a pretext for the trip, thereby defrauding the State of West Virginia of resources in the amount of $336.09.

43.    From on or about October 16, 2011 to on or about October 18, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., provided information which resulted in the creation of false Daily Labor Reports claiming that E.M.T. had performed legitimate state business from on or about October 16, 2011 through on or about October 18, 2011, even though during that time period, E.M.T. had in fact traveled from at or near Buckhannon, West Virginia to at or near Montreal, Canada, at the direction of **ANDREW**, to transport a piece of equipment sold by WVDOH to a buyer at auction, thereby defrauding the State of West Virginia and depriving it of wages and resources.

44.    From on or about October 17, 2011 to on or about October 20, 2011, defendant **ROBERT GLEN ANDREW, II** and others, including E.M.T., drafted a fraudulent request for travel authorization and completed and submitted a false Travel Expense Account Settlement

claiming that the purpose of E.M.T.'s travel on or about October 16, 2011 through on or about October 18, 2011 was to assess equipment for possible purchase and tour a manufacturing facility and was in connection with his assigned duties, and seeking reimbursement for expenses of the trip even though E.M.T. completed no legitimate state work on or about October 16, 2011 and any state work he completed on or about October 17, 2011 through on or about October 18, 2011 was merely a pretext for the trip, thereby defrauding the State of West Virginia of resources in the amount of $335.40.

### *GSA Scheme*

45.     On or about October 22, 2011, at a WVDOH auction conducted at or near the Equipment Division, defendant **ROBERT GLEN ANDREW, II** sold, and directed others to sell, a 1991 P&H Century Rough Terrain crane (ED# 337-085) for $32,000.00.  The WVDOH had acquired the crane through GSA as federal excess property with an acquisition-cost value of $110,000.00 on or about October 26, 2010, and did not have the legal authority to sell or otherwise dispose of the property.

46.     On or about May 12, 2012, at a WVDOH auction conducted at or near the Equipment Division, defendant **ROBERT GLEN ANDREW, II** sold, and directed others to sell, a 1990 Ford F900 dump truck (ED# 261-420) for $2,500.00.  The WVDOH had acquired the dump truck through GSA as federal excess property with an acquisition-cost value of $110,910.00 on or about June 7, 2011, and did not have the legal authority to sell or otherwise dispose of the property.

47.     On or about April 13, 2013, at a WVDOH auction conducted at or near the Equipment Division, defendant **ROBERT GLEN ANDREW, II** sold, and directed others to sell, a 1999 Freightliner M915A4 road tractor (ED# 283-7118) for $6,250.00.  The WVDOH had

acquired the tractor through GSA as federal excess property with an acquisition-cost value of $70,832.00 on or about July 26, 2012, and did not have the legal authority to sell or otherwise dispose of the property.

48.    On or about April 13, 2013, at a WVDOH auction conducted at or near the Equipment Division, defendant **ROBERT GLEN ANDREW, II** sold, and directed others to sell, a 1999 Freightliner M915A4 road tractor (ED# 283-7119) for $9,250.00.  The WVDOH had acquired the tractor through GSA as federal excess property with an acquisition-cost value of $70,832.00 on or about July 26, 2012, and did not have the legal authority to sell or otherwise dispose of the property.

49.    On or about April 13, 2013, at a WVDOH auction conducted at or near the Equipment Division, defendant **ROBERT GLEN ANDREW, II** sold, and directed others to sell, a 2002 Freightliner M915A4 road tractor (ED# 283-7137) for $11,000.00.  The WVDOH had acquired the tractor through GSA as federal excess property with an acquisition-cost value of $70,832.00 on or about November 16, 2012, and did not have the legal authority to sell or otherwise dispose of the property.

50.    On or about April 13, 2013, at a WVDOH auction conducted at or near the Equipment Division, defendant **ROBERT GLEN ANDREW, II** sold, and directed others to sell, a 2002 Freightliner M915A4 road tractor (ED# 283-7141) for $11,250.00.  The WVDOH had acquired the tractor through GSA as federal excess property with an acquisition-cost value of $70,832.00 on or about November 16, 2012, and did not have the legal authority to sell or otherwise dispose of the property.

51.     In or about the end of July 2013, at the direction of defendant **ROBERT GLEN ANDREW, II**, Equipment Division employees R.L.C. and L.J. placed approximately six (6) sheets of aluminum plates into the dumpsters located at or near the Upshur County WVDOH facility located near the Equipment Division.  On or about July 29, 2013, at the direction of the **ANDREW**, E.M.T. accompanied T.B.D. to at or near the Upshur County WVDOH facility and showed him the aluminum plates in the dumpsters.  On or about the same date, T.B.D. removed the aluminum plates from the dumpsters.  On or about August 1, 2013, T.B.D. sold the aluminum plates for $14,843.20 of the total.  The WVDOH had acquired these aluminum plates through GSA as federal excess property with an acquisition-cost value per plate of $3,319.18 on or about August 13, 2012, and did not have the legal authority to sell or otherwise dispose of the property.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNTS TWO  THROUGH EIGHT

(Wire Fraud Relating to MO-TRIM Scheme)

52.     Paragraphs 1-8, 11a, and 12-20 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

53.     In or about 1996, pursuant to West Virginia Code, Chapter 12, Article 3, Section 10a, the State of West Virginia created and implemented the West Virginia State Purchasing Card Program to create more accountability for purchases, improve relations with vendors, and save the State of West Virginia millions of dollars through cost avoidance.  In simple terms, the state purchasing card, often referred to as a P-Card, is a government credit card issued to certain state employees who have cleared an application process.  At all times relevant to the Indictment, the issuing credit card company was Citibank, a subsidiary of Citigroup, Inc., which is headquartered at or near New York, New York.

54.     Effective on or about February 23, 2009, defendant **MO-TRIM, INC.** entered into an open end contract with WVDOH whereby it agreed to provide **MO-TRIM** mower parts and components to WVDOH.   The agreement excluded the purchase of "whole unit components."  In addition, the agreement did not contemplate service by **MO-TRIM** and **MO-TRIM** was to bear the shipping costs.

55.     From in or about February 2009, to in or about August 2014, the defendants, **ROBERT GLEN ANDREW, II**, and **MO-TRIM, INC.**, devised and intended to devise a scheme to defraud the State of West Virginia by means of materially false and fraudulent pretenses, representations, and promises.

56.     It was part of the scheme that, at the direction of defendant **ROBERT GLEN ANDREW, II**, employees of the WVDOH transported WVDOH tractors from various locations within the State of West Virginia, including from the Northern District of West Virginia, to at or near Cambridge, Ohio to have employees of defendant **MO-TRIM, INC.** attach mower whole unit components to the tractors.  It was further part of the scheme that, at the direction of the **ANDREW**, employees of the WVDOH made telephone calls to employees of **MO-TRIM** to authorize the use of their P-Cards to conduct hundreds of transactions totaling in excess of $1 million to purchase whole unit components from **MO-TRIM**.  Examples of these whole unit components included, but are not limited to, rear flail units, side flail units, rotary head units, and short arm units.  Each transaction was made upon receipt of a **MO-TRIM** invoice transmitted either directly to the cardholder or to **ANDREW** who then delivered the invoice to the cardholder for payment.  On occasion, at the direction of the defendant, invoices were split in attempt to prevent the State of West Virginia from detecting the impropriety of the transactions. Each transaction omitted the material fact that these purchases were not permitted by the **MO-TRIM** mower parts contract or any other contract held by the WVDOH.

57.     On or about the dates listed below, within the Northern District of West Virginia, and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud the State of West Virginia, the defendants, **ROBERT GLEN ANDREW, II** and **MO-TRIM, INC.**, knowingly transmitted and caused to be transmitted in interstate and foreign commerce, by means of wire communications, certain telephone calls to authorize certain state purchasing card transactions, as indicated below, each such instance being a separate and additional Count of this Indictment:

24

| COUNT | DATE | ORIGIN | DESTINATION | DESCRIPTION |
|---|---|---|---|---|
| 2 | November 22, 2010 | Buckhannon, WV | Cambridge, OH | At the direction of **ANDREW**, J.B. telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice Nos. 300914, 300915, 300916, 300917, 300918, 300919, & 300920. |
| 3 | March 15, 2011 | Clarksburg, WV | Cambridge, OH | At the direction of **ANDREW**, P.L telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice Nos. 110110, 110111, & 110112. |
| 4 | March 18, 2011 | Clarksburg, WV | Cambridge, OH | At the direction of **ANDREW**, P.L telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice No. 110116. |
| 5 | April 8, 2011 | Clarksburg, WV | Cambridge, OH | At the direction of **ANDREW**, P.L telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice Nos. 110173, 110174, 110175, & 110176. |

| 6 | October 30, 2012 | Buckhannon, WV | Cambridge, OH | At the direction of **ANDREW**, J.B. telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice Nos. 120908 & 120909. |
|---|---|---|---|---|
| 7 | November 1, 2012 | Buckhannon, WV | Cambridge, OH | At the direction of **ANDREW**, L.L. telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice No. 120941. |
| 8 | August 12, 2013 | Buckhannon, WV | Cambridge, OH | At the direction of **ANDREW**, J.B. telephoned an employee of **MO-TRIM** to authorize the use of his state purchasing card to pay Invoice No. 130586. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT NINE

(Mail Fraud Relating to 3-D Salvage Scheme)

58.     Paragraphs 1-3, 5-6, 8, 11b, 12, 21-32 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

59.     The non-public solicitation of three bids is required for a WVDOH contract with a value of $25,000.00 or less.  The WVDOH is required to award the contract to the vendor with the highest bid.

60.     On or about October 26, 2012, defendant **ROBERT GLEN ANDREW, II** and others caused to be created a bid sheet for a 12-month scrap metal salvage agreement with a value not to exceed $25,000.00.

61.     From on or about November 7, 2012, to on or about December 3, 2012, defendant **ROBERT GLEN ANDREW, II** devised and intended to devise a scheme to defraud the true winner of the scrap metal salvage agreement bid by means of materially false and fraudulent pretenses, representations, and promises.

62.     It was part of the scheme that, when on or about November 7, 2012, the Equipment Division received three bids for the salvage contract and T.B.D. was not the high bidder, defendant **ROBERT GLEN ANDREW, II** made a telephone call to T.B.D. and suggested that T.B.D. change his bid.  It was further part of the scheme that, when T.B.D. adopted the suggestion of **ANDREW** and submitted a revised bid, **ANDREW** caused the issuance of the salvage contract to T.B.D. based upon this revised bid.  **ANDREW** knew and had reason to know that the executed contract would be mailed to the West Virginia Department of Transportation.  **ANDREW** knew that the executed contract would contain a materially false representation, i.e., that T.B.D. had submitted the highest bid.

63.     On or about December 3, 2012, at or near Buckhannon, Upshur County, West Virginia, within the Northern District of West Virginia, and elsewhere, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive the true winner of the scrap metal salvage agreement, to wit: J.S., defendant **ROBERT GLEN ANDREW, II** knowingly caused to be delivered by mail at the place at which it was directed to be delivered by the person to whom it was addressed the following matter:  a State of West Virginia Purchasing Division Agreement signed by T.B.D. on or about November 28, 2012, mailed from at or near Buckhannon to at or near the West Virginia Department of Transportation, Division of Highways, Building 5, State Capitol Complex, 1900 Kanawha Blvd. East, Charleston, West Virginia

All in violation of Title 18, United States Code, Section 1341.

## COUNTS TEN THROUGH TWELVE

(Mail Fraud Relating to Political Activity Scheme)

64.     Paragraphs 1-3, 5-6, 8, 11c, 12, 33-40 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

65.     At all times relevant to this Indictment, employees of the WVDOH seeking reimbursement for work-related travel were required to submit a Travel Expense Account Settlement to the WVDOH headquarters at or near Charleston, West Virginia.

66.     At all times relevant to this Indictment, employees of the WVDOH seeking reimbursement for work-related travel were required to do the following on Travel Expense Account Settlements with respect to travel:

   a.   Identify the following information: 1) the purpose of the travel; 2) whether a state vehicle was used; 3) the departure and arrival times of travel; 4) any expenses incurred for, *inter alia*, meals and lodging; and 5) the amount of reimbursement due; and

   b.   Certify that the costs incurred were, *inter alia*, in connection with the employee's assigned duties, and true, accurate and actual costs and expenses.

67.     At all times relevant to this Indictment, with respect to each Travel Expense Account Settlement, an employee's Agency Head or Designee was required to certify that a) the Agency Head or Designee had personally examined and approved the Travel Expense Account Settlement; b) the terms of the expenses were reasonable; c) the terms of the expenses correspond to the assigned duties of the traveling employee; and d) the terms of the expenses meet all State of West Virginia Travel Regulations and are within the agency or unit's budget.

68. At all times relevant to this Indictment, after the Agency Head or Designee made the certification outline in the previous paragraph, the Travel Expense Account Settlements were sent to WVDOH headquarters at or near Charleston, West Virginia for approval.

69. Upon approval, the WVDOH would enter the amount of the reimbursement payment sought, along with additional pertinent information about transaction, into the Financial Information Management System ("FIMS"). Once that entry was made, the West Virginia Auditor's Office completed the entry in FIMS after reviewing and approving the payment, and then printed the check. The West Virginia State Treasury's Office ("WVSTO") then assumed custody of the check and mailed the check to the employee seeking reimbursement.

70. From at least on or about March 27, 2011 through on or about April 29, 2011, defendant **ROBERT GLEN ANDREW, II** used, and directed to be used, state time, employees and equipment to engage in political activity in support of the Tomblin Campaign. The political activity included soliciting and collecting, and directing other state employees to solicit and collect, thousands of dollars in campaign contributions on state time. The political activity also included negotiating and placing, and directing other state employees to negotiate and place, banners hung on tractor trailers throughout the state to advertise for the candidate both on state time and at state expense.

71. In furtherance of this scheme, from on or about March 27, 2011 through on or about March 29, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia, to at or near Ranson, West Virginia, on state time and in a state vehicle, to make arrangements for trailer rentals and land use in the Eastern Panhandle so that banners advertising the Tomblin Campaign could be hung on the trailers.

During that trip, E.M.T. negotiated the use of land with property owners and collected donations for the Tomblin Campaign.

72.     In furtherance of this scheme, on or about March 31, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia to at or near Pennsboro, West Virginia, to collect campaign donations for the Tomblin Campaign.

73.     In furtherance of this scheme, on or about April 4, 2011 through on or about April 5, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia, to at or near Wheeling, West Virginia, on state time and in a state vehicle, to make arrangements for trailer rentals and land use in the Northern Panhandle so that banners advertising the Tomblin Campaign could be hung on the trailers. During that trip, E.M.T. negotiated the use of land with property owners.

74.     In furtherance of this scheme, on or about April 7, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia, to at or near Parkersburg, West Virginia, on state time and in a state vehicle, to collect donations for the Tomblin Campaign.

75.     In furtherance of this scheme, on or about April 8, 2011 through on or about April 11, 2011, defendant **ROBERT GLEN ANDREW, II** and E.M.T. traveled together to at or near the Eastern Panhandle of West Virginia to place trailers and banners for the Tomblin Campaign at the locations E.M.T. had arranged during the on or about March 27, 2011 through on or about March 29, 2011 trip.

76.     In furtherance of this scheme, on or about April 11, 2011 through on or about April 13, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia, to at or near Wheeling, West Virginia, on state time and in a

state vehicle, to make arrangements for trailer rentals and land use at or near the Northern Panhandle of West Virginia so that banners advertising the Tomblin Campaign could be hung on the trailers.  During that trip, E.M.T. negotiated the use of land with property owners.

77.     From at least on or about March 27, 2011 through on or about April 29, 2011, in the Northern District of West Virginia, and elsewhere, defendant **ROBERT GLEN ANDREW, II** along with others known and unknown, with the intent to defraud, devised and willfully participated in, with the knowledge of its fraudulent nature, the above-described scheme and artifice to defraud and obtain money from the State of West Virginia by materially false and fraudulent pretenses, representations and promises.

78.     On or about the dates listed below, within the Northern District of West Virginia, and elsewhere, for the purpose of executing or attempting to execute the above-described scheme and artifice to defraud and deprive the State of West Virginia, defendant **ROBERT GLEN ANDREW, II** knowingly caused to be delivered by mail at the place at which it was directed to be delivered by the person to whom it was addressed the following matters, each matter being a separate and additional Count of this Indictment:

| COUNT | DATE | MAILING | DESTINATION |
|-------|------|---------|-------------|
| 10 | April 1, 2011 | Check No. 1009698144 | E.M.T., 837 Childers Run Road, Buckhannon, West Virginia |
| 11 | April 11, 2011 | Check No. 1009740197 | E.M.T., 837 Childers Run Road, Buckhannon, West Virginia |
| 12 | April 20, 2011 | Check No. 1009791105 | E.M.T., 837 Childers Run Road, Buckhannon, West Virginia |

All in violation of Title 18, United States Code, Section 1341.

**COUNTS THIRTEEN THROUGH FOURTEEN**

(Wire Fraud Relating to Political Activity Scheme)

79.     Paragraphs 1-3, 5-6, 8, 11c, 12, 33-40 of this Indictment and paragraphs 70-77 inclusive of Counts 10 through 12 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

80.     At all times relevant to this Indictment, payroll for E.M.T. was made by direct deposit to his bank account at the First Community Bank at or near Buckhannon, West Virginia.

81.     At all times relevant to this Indictment, WVDOH employees were required to submit their daily work information to a WVDOH employee who consolidated the information for multiple employees in a Daily Labor Report.  A WVDOH Equipment Division employee then keyed the Daily Labor Report into the WVDOH computer system which flowed into the data process section of WVDOH headquarters at or near Charleston, West Virginia.  A report and payroll report would be generated in WVDOH headquarters every two weeks.  WVDOH would then feed the payroll into the payroll system of the West Virginia Auditor's Office electronically, and then passed from the Auditor's Office to WVSTO for payment.

82.     At all times relevant to this Indictment, WVSTO originated Automated Clearing House ("ACH") payments by sending payroll data electronically using a secure ftp site from at or near Charleston, West Virginia to JP Morgan Chase Bank ("Chase") at or near Tampa, Florida. Chase employees located at or near Tampa, Florida, merged the WVSTO payroll data with other Chase originating files and submit them to the Federal Reserve branch for transmission into the ACH network.  The Federal Reserve then separated payments by American Banking Association ("ABA") number and transmitted a file to the corresponding financial institution where the payments were posted to the receiving bank account.

83.    On or about the dates listed below, within the Northern District of West Virginia, and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive the State of West Virginia, defendant **ROBERT GLEN ANDREW, II** knowingly transmitted and caused to be transmitted in interstate and foreign commerce, by means of wire communications, certain bank deposits, as indicated below, each such instance being a separate and additional Count of this Indictment:

| COUNT | DATE | ORIGIN | DESTINATION | DESCRIPTION |
|-------|------|--------|-------------|-------------|
| 13 | April 15, 2011 | Tampa, Florida | Buckhannon, West Virginia | Payroll deposit into the bank account of E.M.T. for pay period March 17, 2011 through March 31, 2011 |
| 14 | April 29, 2011 | Tampa, Florida | Buckhannon, West Virginia | Payroll deposit into the bank account of E.M.T. for pay period April 1, 2011 through April 15, 2011. |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS FIFTEEN THROUGH EIGHTEEN

(Mail Fraud Relating to Post-Auction Scheme)

84.    Paragraphs 1-3, 5-6, 8, 11d, 12, 41-44 of this Indictment and paragraphs 65-69 are realleged and incorporated by reference as if fully set forth herein.

85.    From at least on or about April 25, 2011 through on or about November 15, 2011, defendant **ROBERT GLEN ANDREW, II** used, and directed to be used, state time, employees and equipment to maintain and deliver WVDOH-owned equipment sold at auction even though the terms and conditions of the auction sales included "as-is" purchases and removal at buyers' expense.  This activity included directing subordinate state employees provide maintenance to and deliver equipment on state time to his friends, family members and business associates.  This activity also included directing subordinate state employees, including E.M.T., on state time and using state equipment, to do maintenance and deliver equipment sold at auction.

86.    In furtherance of this scheme, on or about April 25, 2011 through on or about April 28, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia, to at or near Baltimore, Maryland, on state time and in a state vehicle, to do maintenance on and deliver a 2000 Volvo tandem axle dump truck which had been sold at auction to R.I., as arranged by K.W., on or about April 18, 2011.

87.    In furtherance of this scheme, on or about October 16, 2011 through on or about October 18, 2011, defendant **ROBERT GLEN ANDREW, II** directed E.M.T. to travel from at or near Buckhannon, West Virginia, to at or near Montreal, Canada, on state time, to deliver an F-550 dump truck which had been sold at auction to Roley Construction in or about August 2011.

88.    From at least on or about April 25, 2011 through on or about November 15, 2011, in the Northern District of West Virginia, and elsewhere, defendant **ROBERT GLEN ANDREW, II**, along with others known and unknown, with the intent to defraud, devised and willfully participated in, with the knowledge of its fraudulent nature, the above-described scheme and artifice to defraud and obtain money from the State of West Virginia by materially false and fraudulent pretenses, representations and promises.

89.    On or about the dates listed below, within the Northern District of West Virginia, and elsewhere, for the purpose of executing or attempting to execute the above-described scheme and artifice to defraud and deprive the State of West Virginia, defendant **ROBERT GLEN ANDREW, II** knowingly caused to be delivered by mail at the place at which it was directed to be delivered by the person to whom it was addressed the following matters, each matter being a separate and additional Count of this Indictment:

| COUNT | DATE | MAILING | DESTINATION |
|---|---|---|---|
| 15 | May 3, 2011 | ANDREW Memorandum | West Virginia Department of Transportation, Division of Highways, Building 5, State Capitol Complex, 1900 Kanawha Blvd. East, Charleston, West Virginia |
| 16 | May 17, 2011 | Check No. 1009896148 | E.M.T., 837 Childers Run Road, Buckhannon, West Virginia |
| 17 | October 17, 2011 | ANDREW Memorandum | West Virginia Department of Transportation, Division of Highways, Building 5, State Capitol Complex, 1900 Kanawha Blvd. East, Charleston, West Virginia |
| 18 | November 4, 2011 | Check No. 1010456390 | E.M.T., 837 Childers Run Road, Buckhannon, West Virginia |

All in violation Title 18, United States Code, Section 1341.

36

## COUNTS NINETEEN THROUGH TWENTY

(Wire Fraud Relating to Post-Auction Scheme)

90.     Paragraphs 1-3, 5-6, 8, 11d, 12, 41-44 of this Indictment, and paragraphs 80-82, and paragraphs 85-88 inclusive of Counts 15 through 18 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

91.     On or about the dates listed below, within the Northern District of West Virginia, and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive the State of West Virginia, defendant **ROBERT GLEN ANDREW, II** knowingly transmitted and caused to be transmitted in interstate and foreign commerce, by means of wire communications, certain bank deposits, as indicated below, each such instance being a separate and additional Count of this Indictment:

| COUNT | DATE | ORIGIN | DESTINATION | DESCRIPTION |
|-------|------|--------|-------------|-------------|
| 19 | May 16, 2011 | Tampa, Florida | Buckhannon, West Virginia | Payroll deposit into the bank account of E.M.T. for pay period April 16, 2011 through April 30, 2011. |
| 20 | November 15, 2011 | Tampa, Florida | Buckhannon, West Virginia | Payroll deposit into the bank account of E.M.T. for pay period October 17, 2011 through October 31, 2011. |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS TWENTY-ONE THROUGH TWENTY-SEVEN

(Causing Thefts of Government Property Relating to GSA Scheme)

92.    Paragraphs 1-3, 5-6, 8, 11e, 12, 45-51 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

93.    On or about the dates listed below, at or near Buckhannon, Upshur County, West Virginia, within the Northern District of West Virginia, defendant **ROBERT GLEN ANDREW, II** willfully caused to be converted to the use of another, and willfully caused to be sold, conveyed, and disposed without authority a thing of value of the United States or any department or agency thereof, to wit:   federal excess property belonging to the General Services Administration, each such instance being a separate and additional Count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 21 | October 22, 2011 | At a WVDOH auction conducted at the Equipment Division, the defendant caused a 1991 P&H Century Rough Terrain crane (ED# 337-085) to be sold to another person. |
| 22 | May 12, 2012 | At a WVDOH auction conducted at the Equipment Division, the defendant caused a 1990 Ford F900 dump truck (ED# 261-420) to be sold to another person. |
| 23 | April 13, 2013 | At a WVDOH auction conducted at the Equipment Division, the defendant caused a 1999 Freightliner M915A4 road tractor (ED# 283-7118) to be sold to another person. |
| 24 | April 13, 2013 | At a WVDOH auction conducted at the Equipment Division, the defendant caused a 1999 Freightliner M915A4 road tractor (ED# 283-7119) to be sold to another person. |
| 25 | April 13, 2013 | At a WVDOH auction conducted at the Equipment Division, the defendant caused a 2002 Freightliner M915A4 road tractor (ED# 283-7137) to be sold to another person. |
| 26 | April 13, 2013 | At a WVDOH auction conducted at the Equipment Division, the defendant caused a 2002 Freightliner M915A4 road tractor (ED# 283-7141) to be sold to another person. |
| 27 | July 29, 2013 | The defendant caused six (6) sheets of aluminum plates to be disposed of to T.B.D. of 3-D Salvage. |

All in violation of Title 18, United States Code, Sections 641 and 2.

## COUNT TWENTY-EIGHT

(Document Tampering)

94.     Paragraphs 1-3, 5-6, 8, 11c, 12, 33-40, 65-78, and 80-83 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

95.     On or about August 20, 2013, at or near Buckhannon, Upshur County, in the Northern District of West Virginia, defendant **ROBERT GLEN ANDREW, II** did corruptly conceal and attempt to conceal records, documents and another object, that is, United States currency, with the intent to impair their integrity and availability for use in an official proceeding, that is, a jury trial, in violation of Title 18, United States Code, Section 1512(c)(1).

## COUNT TWENTY-NINE

(Witness Tampering)

96.     Paragraphs 1-8, 11a, 12-20, and 53-57 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

97.     On or about November 4, 2013, at or near Buckhannon, Upshur County, in the Northern District of West Virginia, defendant **ROBERT GLEN ANDREW, II** knowingly corruptly persuaded and attempted to corruptly persuade M.L. by directing her to testify that **ANDREW** had no involvement in the preparation of bid specifications for a mower contract, with the intent to influence the testimony of M.L. in an official proceeding, that is, a Grand Jury proceeding, in violation of Title 18, United States Code, Section 1512(b)(1).

## FORFEITURE ALLEGATION

**A.    Forfeiture of Proceeds and Property Involved in Count 1 (18 U.S.C. § 1962(d))**

98.    The allegations contained in Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).

99.    Pursuant to Title 18, United States Code, Section 1963, upon conviction of an offense in violation of Title 18, United States Code, Section 1962, set forth in Count One of this Indictment, the defendants, **ROBERT GLEN ANDREW, II** and **MO-TRIM, INC.**, shall forfeit to the United States:

a.    any interest acquired or maintained in violation of Title 18, United States Code, Section 1962;

b.    any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c.    any property constituting, or derived from proceeds obtained, directly or indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962.

100.    The property to be forfeited to the United States pursuant to Title 18, United States Code, Section 1963(a)(1)-(3), includes but is not limited to a money judgment.

101.    If any of the property described in paragraphs 99 and 100 above, as a result of any act or omission of the defendants,

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

41

     c.      has been placed beyond the jurisdiction of the court;

     d.      has been substantially diminished in value; or

     e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 18, United States Code, Section 1963(m).

All pursuant to Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).

**B.** **Forfeiture of Proceeds of Counts 21 through 27 (18 U.S.C. § 641)**

102.    The allegations contained in Counts 21 through 27 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

103.    Upon conviction of offense(s) in violation of Title 18, United States Code, Section 641, set forth in Counts 21 through 27 of this Indictment, the defendant, **ROBERT GLEN ANDREW, II**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to violation(s) of Title 18, United States Code, Section 641, including, but not limited to, a money judgment.

104.    If any of the property described in paragraph 103, as a result of any act or omission of the defendant,

     a.      cannot be located upon the exercise of due diligence;

     b.      has been transferred or sold to, or deposited with, a third party;

     c.      has been placed beyond the jurisdiction of the court;

  d.  has been substantially diminished in value; or

  e.  has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

  All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

        A true bill,


        /s/_____
        Foreperson
        (Signature on File)


/s/_____
William J. Ihlenfeld, II
United States Attorney

Jarod J. Douglas
Assistant United States Attorney

Sarah W. Montoro
Assistant United States Attorney